Moving now to Appeal 23-1809. This is Commodity Futures Trading Commission v. Donelson. Mr. McIlvaney, we'll begin with you. Good morning, Your Honors. Your Honors, this is an appeal from my client, Mr. James Donelson, from an entry of motion for summary judgment and an ultimate finding of liability for a number of claims for fraud brought by the Commodity Futures Trading Commission. This case is as much about what is missing as about what is actually present. Number one, according to, I'm going to refer to it as CFTC if that pleases, according to with their characterization, co-defendant Tim Evans was the mastermind behind the alleged improprieties in this case. Mr. Evans never appeared, he was defaulted, no one knows where he is. This is relevant because my client, Mr. Donelson, purchased Longleaf Trading Group from Mr. Evans in December of 2017. Prior to that, my client was, any involvement he had with Longleaf was not relevant to the proceedings in this case. And prior to that, Mr. Evans is alleged to have engaged in affirmative misrepresentations, affirmative acts of fraud that cost his customers in excess of $3 million. The Time Means Money Program continued after Mr. Donelson assumed the responsibilities of CEO in December of 2017, correct? Judge, it did for a couple of months until Mr. Donelson made a review in February of 2017. That program was not trading successfully. Okay. But the firm continued to promote some form of an investment strategy or trading opportunities and collected commissions on those. And Mr. Donelson was well aware of that activity, he was running the firm. Mr. Donelson was aware of the activity, he was running the firm. Judge, he did change, as soon as it came to his attention how unsuccessful that program was, he implemented a new trading strategy. Okay, all right. Unfortunately, Mr. Donelson's trading strategy was not successful. But there are, this is a fraud case. And there are no, there are no statements of affirmative misrepresentation. In fact, the district court's ruling on the motion for summary judgment emphasizes omissions and fraudulent omissions. But when one looks more closely at those alleged fraudulent omissions, it becomes clear that their, whether or not they're fraudulent is a question of fact. And whether or not my client made those omissions is also a question of fact with regard to Scienter. My client made representations about the kinds of trades that his new model was going to perform. Those types of trades were reviewed by a lawyer and subsequently by an expert, and they were deemed to be reasonable and plausible and likely to, with market conditions obviously not, specific market conditions not being considered, they were, it was possible for  them to be fraudulent. My client, any trades that he identified as actually occurring, they did occur, where trades were hypothetical, where they were speculative, they were clearly identified as being hypothetical or speculative. There is no indication that my client omitted facts that he presented to potential clients or to clients with knowing that they were going to fail, knowing that they were likely to fail, knowing that the potential client would want to know that under Mr. Evans' leadership, trades had failed. How about the track record documents? Judge, the track record documents are from Mr. Donaldson. They are representative of the new model that in certain cases they were successful, they were eventually, again, due to market conditions, the gains were wiped out. What the district court said is that, look, there's a major omission problem here. There's deception because of half-truth, because of how limited the period of time was, the limited the trades were that were captured by the track record documents. A reasonable investor would have wanted to know what the performance looked like from a broader period of time. Judge, I understand that, and I respectfully disagree with the district court's finding because the track records included a span of several months in certain cases. In certain cases, it was a shorter time period, but in other cases, it was over a span of certain months, and Longleaf closed its doors in 2019, so the entire scope of time here is 24 months, and there were several track records that were presented by Mr. Donaldson that encompassed eight months of that time period. So it wasn't as though he was, as characterized by plaintiff, just cherry-picking these numbers. He was using these numbers as illustrative of what his new model could do given certain market conditions, and again, that was something that was supported by an unrebutted expert. Let me ask you a more abstract question. Rule 33.10 sub A targets fraudulent activity, and the district court uses the elements of common law fraud. Do you agree that that's what we should employ when considering the case? I do, and I think knowledge, I think intent to defraud is an important component of common law fraud, and I don't think that's present here. It's possible that Mr. Donaldson made bad recommendations, but that's not fraud, and in this case, the prism through which the plaintiff views this case is though my client is engaging in the most sinister possible activities at every turn, but the fact of the matter is my client was also defrauded by Mr. Evans because he received false information from Mr. Evans when he purchased this company. He immediately turned around within three months and saw that things were not as they seem and that he needed to make an adjustment on the recommendations that he was giving clients. When he gave clients hypotheticals, they were clearly identified as hypotheticals. When he gave them track records, he identified the periods for which the track record applied, and he made the recommendations to the best of his ability, and his approach, his strategy was ratified by Mr. Burnside, which was not given appropriate weight. If the focus is on Sienta, is there anything about this record that implicates the distinction between objective and subjective that the Supreme Court has recently pronounced in the shooting? Judge, I think that my client had an objective basis, good faith basis, to make the representations that he made to his clients at the time that he made them, and I think that's what the record reflects. I think in hindsight, when all the gains are wiped out and when the losses start stacking up, and once again, it may be clear that it was in hindsight, it was poor advice, that's a different thing than Mr. Donaldson trying to defraud by omission his clients. Mr. McElmany, with the clock moving here, would you mind if I turn you to the registration issue? Sure, Judge. Okay. So, with the registration issue, we're talking about an interpretation of Rule 4.14, right? 4.14a6? The CTA registration, Judge? Yeah, exactly, the CTA registration, okay? And here's what I'm worried about with your position, okay? And maybe you can talk me through it. I worry that your construction of the rule, 4.14a6, it reaches a result that you might think of as absurd, and therefore that it can't possibly be a correct construction of the text of the regulation. And here's what I mean. Your position would seem to allow a firm like Lawnleaf to integrate its business in a way where it was serving at one and the same time as both an introducing broker, as Lawnleaf was, okay, and as a commodity trading advisor, as a CTA, doing it all at the same time, integrated, okay? Yes. But what you would say, what your position says is so long as those services as a commodity trading advisor were happening all alongside solely in connection with, in tandem with the work as an introducing broker, there's no obligation to register because the exemption from rule 4.14 kicks in, okay? What seems really, really odd to me about that is the broader statutory construct, the broader statute, the CEA, is very concerned with commodity trading advisors registering and therefore coming under the disclosure obligations that the statute imposes. So, what I'm, that's a very long way of saying I just don't know how your construction of the language of the regulation leads to a result that makes any sense in the broader statutory scheme. Judge, I think that And notice what I'm not asking you about. I'm not asking you about the 1995 letter. Okay. Judge, I, it's, with regard to the registration, I think that question is a little more convoluted. Again, I do think there are quite, I think what makes one an introducing broker and what makes one a CTA are things that are perhaps at the time were not as well understood by Mr. Donaldson as they should have been. Okay. I'm, step back from the fact pattern. Okay. And just stipulate as, stipulate hypothetically that you have an actor that is at one and the same time operating as an introducing broker and as a commodity trading advisor. There's nothing unlawful about that and from everything I can tell it's actually common. I understand, I have the same understanding. Okay, right. So, now walk me through how to interpret that regulation in that world. Judge, I, that is something I, I don't know if I can do that, Your Honor. I, I, my understanding of the introducing broker is that the introducing broker is truly that, a broker that puts a client together with a, with an FCM who is. Right. Right. That, that's my understanding of what an introducing broker is and that a CTA can actually give advice about what that person should do again with an FCM. That is my, so I don't know if I. No, no, no, right. But Mr. Donaldson's position here is, is he's not fighting, at least you're, you're, you're not fighting the kind of fact based point that, that the firm, Longleaf, was both an introducing broker and a commodity trading advisor. What he's doing is he's, he's not saying I disagree with that factually. He's taking the position that I'm exempt from registration and the source of the exemption is the regulation or the rule 4.14A6 because of its solely language. And I've been, I've read the solely language 50 times and what I can't figure out is how does Mr. Donaldson's position not, not just run afoul everything the Commodity Exchange Act is about with respect to the registration of CTAs? That's the part I can't figure out. Judge, I, I, that's a position that I, the CTA registration issue is not something that I focus as much my appeal on. So, I, that's something that I suppose I am. I'm sorry. Okay. I'm, I'm prepared to address. Would you like to reserve the remainder of your time for rebuttal? Please. Thank you. Very good. Thank you, Mr. McElvaney.  May it please the Court, I'd like to start by addressing some of the points made by opposing counsel on the fraud issue and then turn to the registration issue. And I think a couple of important things. First, this case, the CFTC's case specifically focuses, you know, at this point in the proceeding on what Longleaf did during the 25 months when Donaldson was running the company. And as has been pointed out in colloquy, even though there was a change in the trading strategy offered to the advisory customers, the undisputed evidence and Mr. Donaldson's own admissions show that the new trading strategies continued to fail and that virtually all customers lost money. And you can see this by looking at Mr. Donaldson's response to the CFTC's statement of undisputed facts. And again, he admits virtually all customers lost money. He admits that the numbers presented to the district court by the CFTC's investigator, he describes them all as approximately accurate. In other words, accurate enough to show that the customers were losing money. I think I'll turn now to what he said about the track record data. I think for some of the track record data, there was agreement that they reflected actual trading. For some, there's a dispute as to whether there was actual trades or not. But that dispute is irrelevant to this appeal. And we can assume for the sake of argument that there were actual trades. The problem is that Mr. Donaldson's counsel describes the track record data as, quote, representative. And that is exactly what it was not. And we know this because the CFTC's investigator looked at the trading for advisory customers as an entire group for the exact same periods that the track record data covered and found that even if the particular trades that were presented as part of sales pitches as track record were successful, customers on average during those exact same time periods lost money. And again, if you look at Mr. Donaldson's response to the CFTC's statement of undisputed facts, it repeatedly says the numbers by the CFTC's investigator were approximately accurate, showing that, as the district court found, the track record data was precisely not representative. The other point that Mr. Donaldson's counsel tries to make something of is that at least some of the representations were projections, hypotheticals, targets, and the like. And I think based on, to some extent, just the entire well-accepted body of fraud law, but also Supreme Court cases like Matrix and Omnicare, which are under different statutes but I think shed some light here, statements of opinion or projections and the like are deceptive and can be fraud if they are presented in a business context where a reasonable investor would expect them to be taken seriously. We're not talking about— And despite the expert testimony, you think this cannot be characterized as aspirational? Correct. Why? The reason is as follows. I think a good place to start is the Omnicare analysis, which says, let's say, again, a serious business context, a person making a presentation expresses an opinion. The opinion can be fraudulent if it doesn't have a reasonable basis based on what the speaker knows. And the Supreme Court says, well, how do you figure out what the Supreme Court knows? It says, you look at the overall balance of the information that the speaker had. And in this case, assuming we take Mr. Burnside's statement at face value, and I'm going to question that in a minute, but assuming we take it at face value, then we have on the one side an assertion that these trading models were reasonable and could make money. And on the other side, we have Mr. Donaldson's admitted knowledge that month after month after month, his trading models, in fact, were losing money. So you make the point that this information, this misrepresentation was material. And in his brief, your opponent suggests that it either is not material or that, in this case, it ought to be a jury question as an exception to the general rule. What's your reaction to that? My reaction to that is that if someone is in the business of telling clients, I will help you make money in the options market because I have wonderful trading strategies, nothing could be more material than the fact that the advisor has been consistently losing money. And I think that's exactly the sort of inference that no—the contrary inference is one that no reasonable jury could reach, and therefore it is the type of inference that can properly be made on summary judgment. Mr. White, I've been wanting to ask you the next question since you stood up, but I didn't want to interrupt what you had to say. I hope I'm not doing that now. I'm very interested in this Schuette case and its impact on the analysis here. Of course, the first thing that comes to your mind as you read the briefs is, was Mr. Donaldson and company mousetrapped here? Are they now trying to—are they now playing on a different field? Do they have an opportunity to meet the subject—the different scienter requirements that we now are working under? Okay. I have to say that I am not familiar with the particular case you are discussing. The cases I'm relying on are the ones stated in my brief, which I think are broadly consistent with the sweep of fraud law, of common law fraud, and here. So I can't directly introduce that case. However, I think with that caveat, I think it's very hard to say that Mr. Donaldson was in any way mousetrapped because I think it is fairly—a couple of points. First of all, I think it is hard to believe that a reasonable person, subjectively, objectively, whatever, would not know that the fact that he's losing—he purports to be advising people on how to make money in the market, and he consistently loses money, is material, and it's hard to believe that he wouldn't know that representation, that I can make money, I have made money, are misleading, again, subjectively, objectively, what have you. And it's also—and even if he had some reason to believe that his models were reasonable, it's hard to believe that anyone could think that that overcomes this consistent track record over a 25-month period. But again, I have to say I haven't read the particular case you're discussing. Mr. Wright, what's the record show with respect—I know when Mr. Donaldson became CEO, December of 17, how long was he with the firm before that? I don't—I can't swear to this, but my understanding is that he came in from the outside and bought the company and then became CEO. And as I say in my brief, he was a very hands-on CEO. You know, he was—this isn't in my brief, but he actually says that he was sitting in the room when his salespeople were making calls. That's in a deposition attached to our motion. But in any case, he admits that he closely monitored all the trading and all the sales pitches and, in fact, was personally responsible for some of the sales pitches. Mr. Wright, I'd like to ask you about the rule requiring CTAs to register and the exemption to it, 4.14a6. The district court and the CFTC seem to rely on these comment letters as the basis for that interpretation. And what I'm wondering is there's also in the record this CFTC ALJ opinion, UDISC. Yes. Is one better than the other? Does it affect, especially the claim here with regard to the requirement to register as a CTA? Okay. I would say that neither of them is legally authoritative. I think the staff letter and I think the only law I'm aware of on the ALJ is the CFTC's own opinion saying ALJ decisions are not precedent, so for whatever that's worth. Under the Supreme Court's discussion of agency guidance documents in the Kaiser case, since this document, since the various comment letters is the wrong word. They are letters by CFTC staff who do hands-on regulation. So they're letters by people who are actively involved in this, know the industry, but they are still a staff, not the CFTC. Because they are staff, they're entitled to what's sometimes called skidmore deference, which means you give them deference to the extent that they are persuasive. You probably give them maybe a little extra deference because these are people who, again, do this hands-on and are advising the industry on a daily basis. And in this case, it was over a fairly long period of time. They were taking the same view. But when all is said and done, you have two non-authoritative opinions. And to put it simply, in our view, you should adopt the opinion in the letters, not because they're the law, but because they make sense. And they are the best resolution of the issue raised by Judge Scudder. In practice, there are, in fact, many companies that both advise their customers and also help their customers place trades. It is true that there are a lot of companies that do that. Mr. White, can I ask you a question on this part of it? So I agree with you that the 1995 letter from the Staff of Trading and Markets Division makes perfect sense. The difficulty that I have is how does that position reflect the best interpretation of the language? Okay, focusing on the text of Rule 4.14a.6. Okay, and the answer to that question is, I think there were, you know, you're always supposed to look at all the language. Just walk me through the best. Forget the letter. Yeah. Okay, just walk me through the best interpretation of it. Okay, I think it says, okay, registered introducing broker, the person's trading advice. I think there were two clauses that are relevant and that there's one that is particularly relevant to this case. Okay. It is solely in connection with, and now I think here's the key point, its business as an introducing broker. So I think the best way to apply this language to facts is to take any given entity that does some IB type activity and some CTA activity and says, what is the business of that entity? And I think there are a couple of facts about Mr. Donaldson's business that are particularly telling. If you look at his marketing, it focuses. Stay on the law for a second. Okay. I tend to agree with you that your focus is in the right spot because solely doesn't help you much. Right. Okay. And what's the right question to answer or to ask and then seek to answer when you're focused on the business? The business. I guess the question is, does the business refer to the entities as a whole? You know, you look at everything the entity does and say, what business are you in? You know, a silly hypothetical pops into my mind. When I take my car into the shop, they have vending machines for candy. They're not in the candy business. They're in the car business. Now, that's a more extreme case than this, but I think that's one way to think of what business are you in. Now, I guess there is a contrary possible interpretation where business refers to particularly individual activities so that the car dealer, you could say, well, over there they're doing their repair business and over there they're doing their sales business. Don't let me put words in your mouth, but what you're doing with that is you're saying you need to ask the question, what's the primary, what's the principle, what's the predominant business of the firm? Yes. And if the predominant, whatever the best term for that is, okay, if the predominant business is that of an introducing broker, you all call it IB, okay, is that of an introducing broker, the exemption might apply. Yes. Okay. But the difficulty that I have is the world where you have a firm that is through and through a commodity trading advisor, and they also just so happen to be an introducing broker. The law doesn't prohibit them from wearing both hats, in my understanding, which you've confirmed is they often do. Right. Okay. That's why I think the term business, you've got to focus on what's the principle, primary, predominant business of the firm. Otherwise, the rule defeats the statute. That is exactly the CFTC's position. It's just the problem with the letter is the letter doesn't grapple with the language of the regulation. The letter is more of a legal policy explanation. Yes. I think the letter presumes the legal analysis that you have suggested and that I think is correct. And then, again, that's drafted, the letter's drafted by the people who do the hands-on counseling business day-to-day, so I think they have that legal framework in the back of their minds, and then they're coming up with some practical, again, it's a guidance document, it's not a rule. It's guidance as to how can you take the legal concept that you've put on the table and give practical advice to a business person as to how to apply it. Let me ask a question as to whether I'm properly situated here and the consequences for the judgment. This discussion we're having is with regard to charge four of the six charges, failure to register as a CTA, correct? Yes. Does that have any impact, exemption or not, with regard to the judgment, docket entry 125? You're talking about, I guess, the final relief judgment? Correct. Okay. I would say it clearly has no effect on restitution because that's based on customer losses or disgorgement, which is tied to the Ogatan gains. I think you can make an argument, I think it would be a wrong argument, you can make an argument that if we were to lose just on that count, it could affect civil monetary penalties. The reason I think that argument is wrong in this case is that the civil monetary penalties awarded by the judge in the final judgment were, I believe, cut down to one-sixth, if I did my calculation right, of the statutory maximum. And I think given the seriousness of the fraud here and the presence of regulatory violations even going beyond the registration issue and the fact that Donaldson was very much hands-on. This isn't some guy who owned a company and then had a bunch of bad people working for him. He was a real actor. If you put it all together, I think that the civil monetary penalty in this case is fully justified, even if we should lose one of the counts. The count that I saw quite linked to registration, I think what you just described makes sense, is count five. In other words, if there was no requirement on Mr. Donaldson as a controlling person to register the firm as a CTA, they're not under a CTA-based disclosure obligation for purposes of count five. So in other words, five rises and falls with count four. I guess for the disclosure, I think that's right. For the disclosure issues. Yes, but the fraud itself and the common-sense omissions as opposed to regulatory omissions, which I think it's fair to say are the big items here, are all independent of the registration issue. They may be big items from a dollar standpoint, but as far as I can tell, no court's weighed in on this registration issue, and the registration issue seems like something that the CFTC would care about as a legal matter, given the number of CTAs that are wearing hats as introducing brokers. Now, I'm past my time, but may I answer that? Yes. I think the answer is that Mr. Donaldson has a somewhat unusual business model, and in that on the one hand, he is offering a full-scale trading program giving systematic detailed advice, and on the other hand, he is doing this in connection with an FCM and sharing commissions. And it turns out that most CTAs use different business models, and in fact, one way or another, the CFTC has, if you read the whole Code of Federal Regulations, one way or another, the CFTC has unambiguously dealt with those. So we have Mr. Donaldson with his somewhat idiosyncratic model that falls within an area, which again, I think the language dictates registration, but it hasn't come up because it's idiosyncratic. Now, if he wins on this point, I guess other people might start following in his lead and see this as a way to offer trading programs without providing the disclosures and so forth. But so far, it just hasn't come up a whole lot. Thank you. Thank you, Mr. White. Well, now, Mr. McElmany, I'll go back to you for rebuttal. Good morning again, Your Honors. Judges, I'll keep it brief. Mr. White states that the CFTC's approach and overall view in this case focuses on 25 months of Donaldson's tenure, but that's not entirely accurate. As I identified before, the way this entire case was framed is that from the outset, from Mr. Evans's stewardship through Mr. Donaldson's, that this is an ongoing fraud and that Longleaf customers lost money the entire time and that the trading strategies were substantially similar and that the implication is that Mr. Evans and Mr. Donaldson were, if not in this together, they were operating as a tag team or a baton situation. And that just couldn't be further from the truth. As I mentioned earlier, Mr. Donaldson immediately amended Longleaf's trading strategies. He admits that the customers lost money. He's not trying to hide anything about customers losing money. He was trying desperately to implement a trading strategy and system that would help his customers make money. He himself lost money throughout this endeavor. And the fact that there's a dispute about the track record, that there's a dispute about whether or not the trades are representative, that there's a question about whether or not Mr. Donaldson, at best there's a question about whether or not Mr. Donaldson had, knowing he acted with recklessness or callous disregard or met the intent to defraud element of fraud. There are disputes about all these things. And that precludes summary. Thank you, Judge. Mr. McElveen, I want to apologize. I asked you a question about a Supreme Court case that actually applies to the next case. But you did a fine job answering. Thank you, Judge. Thank you. Thank you, Mr. McElveen. Thank you, Mr. White. The case was taken under revision. Thank you, Your Honor. We are now going to move.